Our first case today is 2017-2017 ICOS Corporation v. Actelion Pharmaceuticals, Ltd. Mr. Feldstein, please proceed. Thank you, Your Honor. May it please the Court, Mark Feldstein on behalf of ICOS Corporation, the appellant. There are three related issues in this case that all of the problems in the Court's decision stem from. The first is that there is undisputed evidence that there is no generic motivation to micronize drugs. Without a pre-formulation analysis, you can't know what problem there may be that you would want to solve. There was also no specific motivation to micronize Tadalafil. Failing to have evidence of those two pieces of the puzzle, Actelion couldn't meet its burden of showing that the claims of the patents were obvious. What the Patent Office did instead is the Patent Office made new arguments and shifted the burden to ICOS to disprove obviousness. And they had to do so, they did so, and they had to do so because Actelion simply didn't meet its burden. Why do you say the Patent Office shifted the burden? So they're clear, well, first of all... I mean, there's language in there about the evidence not being sufficient to overcome the evidence submitted on the other side of the issue. But that's what the Board does. It weighs and balances evidence. So first, I don't think that Actelion disputes that there was a shift in, at the very least, the burden of production. They cite dynamic drinkware for the concept that it's OK to shift the burden of production. And they ask, I believe in their third question presented, for this court to affirm. But it's more than just language, Your Honor. If you look at the PTAB decision in Actelion 1 at appendix page 15, for example, the PTAB required ICOS to prove why, after Tadalofil is micronized, an early stage of pre-formulation, even if only for testing purposes, an ordinary artisan would later, during formulation, abandon that approach. It was expressly shifting the burden to ICOS to affirmatively prove why, if it was micronized early, it would continue to be micronized later. They similarly, in terms of motivation to improve Dogan, where there was nothing clearly to improve, Patent Office at appendix 16 says, again, it's not a matter of language. They expressly say, patent owner has not presented sufficient evidence or persuasive argument to show that the information from a pre-formulation analysis would have deterred an artisan from pursuing it. So it's not simply that they're weighing the evidence. They're saying, the burden is on you, patent owner, to show evidence that would have deterred an artisan from going forward. When they got to the question of the absence of a pre-formulation analysis, because there is no pre-formulation analysis data available for Tadalofil. There's no pre-formulation evidence or analysis for Tadalofil? Tadalofil, that's correct, your honor. The sole piece of information, well, there are little tidbits. So Dogan says that Tadalofil is poorly soluble without reporting its solubility. There's no report of solubility. You don't know what poorly soluble means. There is evidence of its melting point. And Dogan includes a melting point of 302 degrees, which is known to correlate with extremely poor solubility. So those pieces of information are known. But there's no solubility analysis to determine the solubility is 1 microgram, 20 micrograms, 100 micrograms. And without that, you can't know whether you're solubility limited. There's also, while there's evidence suggestive of permeability issues, the fact that Dogan reports that Tadalofil forms a suspension in an organic solvent, Labrophil, indicates that it's not dissolving in the organic solvent. It's suggestive of a permeability problem. But there's simply no permeability data on Tadalofil. And so one can't know whether the absorption of Tadalofil will be permeability limited. And what Wabke, one of the references they rely on, teaches is that... Isn't there a site at 848.25 that Tadalofil is a highly permeable drug? There's no evidence in the prior art that Tadalofil is permeable. There's evidence post-data prevention of what the permeability is, but none in the prior art. And so you're at the point... I guess you need to confront the issue, though, of what was the primary basis of the board's obviousness finding, which was that there is a connection between dissolution and solubility. And there was an understanding that micronization can improve dissolution, and thereby, in turn, improve solubility, and thereby, in turn, improve bioavailability. Well, there's a key problem there that the patent office made that Your Honor, quoting them as repeated, is that dissolution particle size does not at all affect solubility. You can't make it smaller to increase solubility. That's part of the problem here. And without knowing whether you're solubility-limited, permeability-limited, or dissolution rate-limited, there's no motivation to micronize. You don't know what problem you're trying to fix. And it's not the case that smaller is better. Wabke and Seth, for example, both tell you the problems associated with making things small. It's not the case that faster is necessarily better. The inventors in the 958 patent, they're the ones who point out that clinically, the uptake is not fast enough. And what Dr. Britton, a trans expert, says multiple times is that if you make it too small, inconsistent with a clinical need, you can cause local and systemic toxicology problems. And so there can't be a general motivation to make small. There can't be a general motivation to make faster. Because you need to know first, the only reason to make small is if you're dissolution rate-limited. If you're solubility-limited, this is an error in the patent office decision. Solubility is not affected by reducing particle size. You cannot overcome that. That's where the Butler reference came in and taught a way to increase the solubility. And it's what Wabke teaches expressly. Wabke says that if there is, if dissolution is considered slow, the first thing you look for is a more soluble physical chemical form. And if those are unavailable, then you move on to micronization. And it's because micronization does not increase solubility. It's important, for example, Dr. Britton, again, a telehealth expert at Appendix 799798, Dr. Britton agrees that you can't draw a correlation from particle size reduction and increased absorbable dose. What he says is that you need to know about solubility and permeability. And so there's no general correlation between particle size and absorbable dose. It's only in the limited circumstances of dissolution rate-limited, which was not known to be the case for Tadalville. And what Wabke, for example, says is that if you start riding it up, it's a mistaken effort if you're limited by something else such as permeability. Another important point in terms of trying to rely on generalities, what Dr. Britton, a telehealth expert, says is that it's a bad formulator. This is from Appendix 4664 to 66. It's a bad formulator who just throws things in a pot. It's his language. One ordinary skill knows that you have to understand your drug substance first, before you design a formulation. This is the whole concept that ICOH has raised that was not disputed, we believe, by Teleon, that in order to rationally design a formulation, you have to have pre-formulation solubility and permeability data. And in fact, at Appendix 14, the PTAB said they have no reason to doubt  And then they went on their own, su posponte, to argue that, well, we're not convinced that formulators behave rationally. And they cite to this reference, this non-priority reference for that proposition, making an argument that Actelia never made. And so in addition to the lack of a case on motivation to micronize based on generic language, in addition to the burden shifting, the Patent Office made its own arguments on Actelian's behalf, which is an APA violation, and it did so based on non-priority references. If you look at the Actelian 2 decision, there are pages and pages between beginning around page 58 of the appendix, where the whole basis of their opinion, or at least substantial basis of their opinion, is based on this non-priority reference. And most of it is arguments that they are advancing on Actelian's behalf. They've advanced new arguments. Not only is it improper to do it in their 316, where the burden is solely on the petitioner, they do it in the final written decision, denying ICOs any opportunity to respond. And so while it may be true that in some cases the board can come up with its own claim construction, I'm sorry, but I read and understood the board's citation of you to be responsive to your argument, your rational design theory. You cited you. You introduced it. Absolutely. And so I'm not sure what's wrong with the board pointing to portions of you and saying it didn't agree with your arguments about your rational design theory and your citation of you because it pointed to other portions of you and said they didn't think that it supported your argument. I don't see why there's a notice and comment problem with that. Sure. So I can explain. So what Pat and ICOs did in terms of the EU reference, ICOs' expert, Dr. Byrd, said a person of ordinary skill in the art would have understood that you can calculate, based on solubility and permeability, what regime you're going to be in for what's going to limit your absorption. And Dr. Byrd cited a reference by Amidon, a reference by Lipinski, and a reference by you. And Dr. Byrd said that that portion of you, the EU reference, that reflects the understanding that you can figure out what is going to be your limiting factor, what is going to be your bottleneck, that was something a person of ordinary skill in the art knew. The problem is that the board went beyond that to rely on other portions of you that were not linked to the prior art and for which ICOs had no opportunity to respond. The language they use, the PTAB cites in the non-prior art EU reference for why rational formulation, they don't believe that it applies, it contradicts their expert, Dr. Britton. But the board takes that out of context, and because they did it in the final written decision, we didn't even have a chance to respond. What the EU reference says on page 6892, the Patent Office quoted it as, rational formulation design based on pharmaceutical properties of compounds is far from reality. And that's what the board relied on that hadn't come up before. But it was in direct rebuttal to your rational design theory. That's what I don't understand. They're not using it to fill a gap in and say motivation to combine, using that reference in a way that it was never used. You introduced that reference in support of the theory, and the board pointed to a different portion of that reference to say it doesn't support your theory. No, I don't believe we cited it to support the theory of rational design. Well, then why did you cite it? We cited it to explain how a person of skill in the art could understand and would understand that there are three different regimes that limit your absorption. They can be solubility-limited, disillusionment-limited, or permeability-limited, and there are models by which you can determine which regime you're in. The idea of rational design is something that their expert admitted. You wasn't relied on for that. It wasn't addressed by anyone. But the context is important. If you look at the next sentence of the non-priority reference, they're not talking about lack of solubility data or lack of permeability data that inhibits what they call rational design. It says, among many factors, our lack of understanding of the causes of poor oral drug absorption often contributes to long and costly formulation development processes. So you, even in context, isn't saying people behave irrationally. It's that there's not enough information. You need to work harder. You're using up all of your rebuttal time. Would you like to save some? I would like to save my rebuttal, yes. Let's hear from opposing counsel. Thank you. May it please the court, this is a substantial evidence case. The key fact findings made by the board concern how a person's ordinary skill in the art would have interpreted the four references that we relied on in both petitions to support the particle size reduction arguments. These are Daughan Butler, Seth, and Waukee. And, of course, the board's interpretations of the art are also subject to substantial evidence review standard. In this case, just to recap briefly, the board relied on Daughan, as we did, as the primary reference. Daughan invented the dilapidic glaxo, and the Daughan reference that we relied on was his PCT publication disclosing oral formulations of that drug using specific excipients for the purpose of treating erectile dysfunction and specific dosage ranges that were disclosed. That was the starting point for our obviousness analysis. And as we pointed out in both petitions, when you compare the claims of the two patents in issue, I reproduced them on the inside cover of the red brief. You can see they have a common limitation, a reduced particle size to below 40 microns. That was a common issue between both IPRs. We addressed that limitation, which is not taught in Daughan, by pointing to the Seth patent, a prior art reference, as well as the Waukee book chapter, also in the prior art. Both of those were relied on by the board, and these are at A13 and A58, for the proposition that if a drug has low solubility, it will dissolve slowly. That's called slow dissolution. And in order for a drug to get into the body when it's administered orally, it must first dissolve the dissolution process, and then it must be absorbed. Both of these references, Seth and Waukee taught that since dissolution precedes absorption in this overall process, any low solubility of the drug leading to low dissolution is going to impact the entire process down the line and ultimately slow down the absorption of the drug. Both of those findings are at A16 and A64. And so both of these references were relied on as teaching that the known low solubility of Tadalafil, which is taught in the Butler reference, we relied on Butler for that, would have been interpreted by persons skilled in the art, based on the knowledge such persons have concerning the concepts taught in Seth and Waukee, that the drug simply wouldn't dissolve fast. It would dissolve too slow. You would need to do something about it. And then what we also relied on Seth and Waukee for was the teaching of common pharmaceutical techniques for addressing that problem of slow dissolution. The most common technique used in the art is to grind the drug. It's called micronizing, and specifically to grind it to the size range claimed in the patents. The second Actillion decision at A58 refers to this grinding process in Seth as frequently used. The first decision at A13-14 calls it a conventional method. Similarly calls it a commonly employed practice. So the board's interpretation of the art is solemnly grounded in the art. I also cited in the red brief the citations to our own expert testimony on that. I'm not going to go through all of that here today. And it was based on this art, Dalgan, Butler, Seth, and Waukee, that the board concluded at A26 and A58 that a person skilled in the art would have had a reasonable expectation that micronizing to Daliphyl would have the effect of improving its absorption in the Dalgan formulations because they knew it was a poorly soluble drug, and they knew that poorly soluble drugs typically are micronized as one of the conventional methods that was taught in the art. The only other issue that the board had to deal with in the case on our petition grounds were the excipient limitations in the second patent, the water-soluble diluent, etc. And they found that all of those were disclosed in the Dalgan reference. As I mentioned, Dalgan formulated the drug for papillocin capsules. Those findings are in A11 and A12. And as I pointed out very close to the end of my brief, those arguments were never— You know your opposing counsel didn't raise any of this argument, so now you've opened the door to him to raise it on rebuttal when he wouldn't have been able to otherwise. But why don't you talk about you, which you did raise? I'm happy to talk about it. So you was introduced by ICOS, as Your Honor recognizes. And we responded to you by pointing out that although it's not a prior art reference, the portions that were emphasized at trial by both us and ICOS's counsel concern the same text, where we pointed out that you is just teaching the same thing that Seth and Waki already taught, that when drugs are poorly soluble, they will have a dissolution problem. We also pointed to you's characterization of the drug risiofolvin, which is discussed in the last two pages of the reference. And that's a well-known prior art drug that we already discussed in our petition and other references. That was a drug that was characterized as a so-called solubility-limited drug, which was ICOS's argument. And yet you showed that even with risiofolvin, micronization of the drug doubled its absorption, which is exactly what we're talking about. So that was how it arose in the proceedings. It wasn't our argument. It wasn't the basis for our petitions. We certainly responded to it. And I think what the decisions of the board reflect is a very thorough analysis of all the parties' petitions and arguments, and just weighing the evidence and arguments that the parties supplied. But to reiterate, our petitions were based on Dalgan, Butler, Seth, and Waki, and the findings based on those references in terms of particle size reduction have substantial evidence support in the record. So could you just answer the question why pre-formulation analysis isn't required in this instance? Well, the board found that, first of all, you're already starting with a formulated drug in Dalgan. So pre-formulation analysis to determine how to make a formulation wouldn't even be your starting point. If Dalgan is your starting point, you've got formulations. And the only difference between Dalgan and these claims at issue is whether to micronize the drug. But more importantly, what both board decisions found is, why would you need to do that when you already know that the drug is poorly soluble? And as taught in Seth and Waki, you'd expect the drug to have slow dissolution. That's confirmed also in the U reference that ICOS relied on to support this argument. So the board concluded it wouldn't be necessary to carry it out because obviousness doesn't require absolute predictability. It requires a reasonable expectation of success. And based on what's taught in Seth and Waki, there's a reasonable expectation that the drug would dissolve slowly. There was a lot of post-filing evidence that was introduced that the Actelium I decision tried to resolve ultimately concluded that it didn't buy ICOS' argument, agreed with our experts' arguments. But I don't think that those reliance on the post-filing arc was really relevant to begin with. As found in the second decision, Judge Sneddon in Actelium II pointed out, if we look at the arc that existed at the time of filing, we're talking about 1998, which we use as the critical date, 1999 was the filing date. Butler, Dowd and Seth and Waki supported our position by a preponderance of the evidence, and that's why we won. I hope I'm answering your question, Judge Chen. Yes. Okay. So I'm not going to re-argue all the other issues that have come up in the case. I want to rely on the red brief for that unless there are questions on that. But I just want to point out there was one statement that my friend mentioned in his argument that there was nothing to improve in Dowgan. That is a new argument. It wasn't raised before the board. I'm not even sure I read it in the blue brief, but our position is that's a new argument. If you have questions about that, I'd be happy to answer them. Otherwise, I've got nothing more. Okay. Thank you, Mr. Riddle. Mr. Feldstein, you have a little bit of rebuttal time. Thank you. So let me start pointing to the Waki reference raised by Excellence Counsel. Excellence Counsel relies on Seth and Waki to say, oh, they uniformly point in favor of dissolution and that any slow dissolution will slow down absorption. That's actually just wrong to say that any slow dissolution will be increased by particle size. The whole point of Waki in pages 4023 and 4024 in the appendix are that it's a mistaken effort to reduce particle size if you're permeability limited. And even in the context of where you have relatively low solubility, which isn't the case for tabalafil, you need to go look at permeability to understand what to do. And in terms of the counsel raised an argument saying that our argument about Dogan not having a problem to solve is new, that we believe is in a reply brief, page nine. Your reply brief, page nine. Correct. Okay. Okay, I thank both counsel. The case is taken under submission. Thank you, Your Honors.